IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF RECORDS HELD BY AT&T, T-MOBILE, AND VERIZON WIRELESS | Case No. 2:24-mj - 89 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Michael DiCaprio**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant for records and information associated with certain cellular towers ("cell towers") that are in the possession, custody, and/or control of AT&T Corporation ("AT&T"), a cellular service provider headquartered in North Palm Beach, Florida; Verizon Wireless ("Verizon"), a cellular service provider headquartered in Bedminster, New Jersey; and T-Mobile US, Inc. ("T-Mobile"), a cellular service provider headquartered in Parsippany, New Jersey. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T, Verizon, and T-Mobile to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I have been a Special Agent of the FBI for over 16 years. Since September of 2019, I have been assigned to the Joint Terrorism Task Force (JTTF) of the Albany Field Office, where, among other things, I am responsible for conducting national security investigations of potential violations of federal criminal law. Prior to that assignment I served over 11 years on the JTTF at

the John F. Kennedy International Airport Resident Agency (JFKRA) of the New York Field Office. Over the course of my time as a Special Agent, I have received training and have experience in criminal and national security investigations, as well as matters involving domestic and international terrorism, and have been afforded the opportunity to work on a significant number of criminal investigations involving cellular telephones, including historical and prospective cell-site data from wireless providers, as well as tracking devices on vehicles. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.　　The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.　　Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 32 [Destruction of Aircraft or Aircraft Facilities] (the "Subject Offense") have been committed by an unknown person or persons. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as further described in Attachment B.

## STATUTE UNDER INVESTIGATION

5.　　Under 18 U.S.C. § 32 (3), whoever willfully sets fire to, damages, destroys, or disables any air navigation facility, or interferes by force or violence with the operation of such facility, if such fire, damaging, destroying, disabling, or interfering is likely to endanger the safety of any such aircraft in flight, shall be guilty of a crime.

## JURISDICTION

6.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      The United States, including the Federal Bureau of Investigation (FBI), is investigating violations of the Subject Offense by persons unknown, occurring in June of 2024. There is probable cause to believe that unidentified persons were responsible for damage sustained at the Federal Aviation Administration (FAA) air navigation facility located in Washington, Vermont, which rendered the facility inoperable.

### Communication with the Vermont State Police and Federal Aviation Administration

8.      On July 7, 2024, Systems Service Center ("SSC") personnel with the Federal Aviation Administration (FAA) located at Burlington International Airport ("Burlington Airport") reported a vandalism incident, to the Vermont State Police ("VSP"), that was observed on July 2, 2024 at the Very High Frequency Omnidirectional Range ("VOR") station located at 784 Cyr Heights Road, Washington, Vermont.  The report claimed that on July 2, 2024, SSC technicians had visited the VOR station to perform routine maintenance.  At that time, they observed the following damage to the facility:

> a.   Four monitor antennas had been removed from the station.
>
> b.   Guard panels on the station's HVAC unit had been smashed in.
>
> c.   The cover of a cable junction box had been torn open and cabling inside the box appeared to be tampered with.

      d.  The door handle for the second-story structure access door had been torn off and the door was open.

      e.  Antennas located inside the second-story structure were bent out of normal operational position.

9.     FAA SSC personnel explained that the VOR station is property of the FAA and services the area surrounding the EF Knapp State Airport ("MPV") located in Berlin, Vermont. The VOR station is described to be an aviation navigation tool that aids aircraft operating under Instrument Flight Rules within the VOR service area, by providing aircraft with location and heading information, as they transit through and within the service area. The station acts as a beacon, sending out a 360-degree high frequency signal to aircraft alerting them of their location with respect to the beacon. The station generally serves aircraft as they are on final approach into MPV. As a result of the reported damage, the MPV VOR station was out of service.

10.    On July 7, 2024, VSP and FAA personnel conducted an initial site visit of the MPV VOR Station, which revealed that the station does not have security camera monitoring, and the station is located in a remote area. Additionally, FAA SSC personnel advised that the area is known to be frequented by All-Terrain Vehicle ("ATV") enthusiasts who access it by way of a dirt trail system. The area is also known to be utilized as a hang out spot for area youth. However, the FAA was not aware of any past instances of vandalism to the station.

11.    During the initial site visit, VSP captured images of the observed damage to the VOR station which are captured below:



a.   FAA sign posted at the access gate to the MPV VOR station.



b.   MPV VOR station with FAA sign on facility access gate



c.  Two monitor antennas removed from normal position and lying on the ground.



d.  Monitor antenna with broken cable lying on the ground.



e.  HVAC unit guard panels smashed in.



f.   Cable Junction Box torn open.



   g.  Broken door handle to the second-story structure access door.



   h.  One of the second-story internal antennas that was bent inward from normal

       position.

12.    On July 17, 2024, your affiant, along with VSP and FAA personnel conducted a

follow-on site visit at the MPV VOR station in order to process the scene for evidence. During the site visit, FAA personnel advised that VOR technology is presently being used as a back-up emergency navigation tool to aid both commercial and general aviation aircraft on final approach during inclement weather or times of disruption of GPS service, which is presently the primary mean of aviation navigation. VOR technology continues to play a vital role in aviation navigation; especially for general aviation aircraft, as some smaller aircraft are not yet equipped with GPS navigation aids. Over the last several decades, the FAA has decommissioned a large number of VOR stations throughout the United States and are currently operating with a minimal VOR footprint. FAA personnel advised that the MPV VOR is one of only two operational VOR stations in the state of Vermont, and it mainly services MPV aircraft operations, which were estimated to be 20 to 30 daily operations.

13.    On July 3, 2024, upon identifying the MPV VOR service outage, FAA personnel, through MPV, issued a Notice to Airmen (NOTAM) advising area pilots of the service outage. Below is a screenshot of the above-mentioned NOTAM, which shows that the MPV VOR was estimated to be out of service from July 3 through July 31, 2024.



14.     FAA personnel advised that the MPV VOR station has operational safeties in place and will shut down if these safeties are engaged.  FAA personnel further added that the removal of the monitoring antennas was likely the main cause of the system outage as once a monitor antenna is removed from its mounted position and there is disruption in communication with the antenna, the station will shut down.  During the visit FAA personnel reviewed activity logs for the

MPV VOR station, which determined that the MPV VOR station shut down on June 30, 2024 at 1808 Z time, which converts to 2208 or 10:08 PM Eastern Standard Time (EST).  FAA personnel advised that this date and time was significant as it represented the time when the vandalism incident occurred.   See below screenshots of MPV VOR activity logs showing the service disruption on June 30, 2024.



15.     During the follow-on site visit, VSP and FAA personnel, along with your affiant, conducted a walk-through of the station and discovered the broken piece of the door handle for the entrance door to the second-story structure.  The item was found within the fenced in area of the facility, but in close proximity to the perimeter fence located near an established vehicle dirt path that headed toward the rear side of the facility, into the wood line.  In my training and experience,

it is assessed that this location is where the persons responsible for the damage to the MPV VOR station would have entered the facility.  See below image which details placement of the broken door handle as well as the nearby vehicle dirt path.



Image of location where broken door handle was discovered.



Image of vehicle dirt path leading into wood line

16.     Based on my training and experience, I am aware that people regularly carry cell phones with them, even in rural areas. Based on the rural nature of the location of the MPV VOR station, I believe that the information requested in this warrant would be useful in identifying the very few individuals likely to have been in the area at the time of the damage to the facility.

17.     On July 16, 2024, law enforcement conducted open-source Internet queries of the MPV VOR station and obtained the following address and latitude/longitude data:

   a.   MPV VOR Address: 784 Cyr Heights Road, Washington, Vermont 05675

   b.   Associated Latitude/Longitude Data: 44.085484/ -72.449379



Overview image of the MPV VOR Station location in Washington, Vermont

**Background Relating to "Tower Dumps" and Relevant Technology**

18.    In my training and experience, I have learned that AT&T, Verizon, and T-Mobile are companies that provides cellular communications service to the general public. In order to provide this service, many cellular service providers maintain antenna towers ("cell towers") that serve and provide cellular service to devices that are within range of the tower's signals. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. By communicating with a cell tower, a wireless device can transmit and receive communications, such as phone calls, text messages, and other data. When sending or receiving communications, a cellular device does not always utilize the cell tower that is closest to it.

19.     Based on my training and experience, I also know that each cellular device is identified by one or more unique identifiers. For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The types of identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

20.     Based on my training and experience, I know that cellular providers, such as AT&T, Verizon, and T-Mobile, routinely and in their regular course of business maintain historical records that allow them to determine which wireless devices used cellular towers on the cellular provider's network to send or receive communications. For each communication sent or received via the wireless provider's network, these records may include: (1) the telephone call number and unique identifiers of the wireless device that connected to the provider's cellular tower and sent or received the communication ("the locally served wireless device"); (2) the cellular tower(s) on the provider's network, as well as the "sector" (i.e., face of the tower), to which the locally served wireless device connected when sending or receiving the communication; and (3) the date, time, and duration of the communication. These records may also include the source and destination telephone numbers associated with the communication (including the number of the telephone that was called or that called the locally served wireless device) and the type of communication (e.g., phone call or SMS text message) that was transmitted.

21.     Additionally, based on my training and experience, I know that the aforementioned cellular providers maintain constant communication between cellular towers and their customer's cellular phones to ensure that the best possible signal is available. This constant communication will provide an approximate location of a particular cellular telephone at any particular time. Each cellular provider maintains records of these communications; more specifically, geographic location information, including global positioning system (GPS) precision location tracking information and Precision Location and/or Cellular Phone Tower Information (Including IAP System Identity), and this data is stored on the cellular provider's server.  These specialized location records, including timing advance data (T-Mobile), real time tool (RTT) (Verizon), and location database of record (LCDBOR) (AT&T), include but are not limited to, estimated latitude and longitude (along with confidence level) and distance from the tower.

22.     On July 18, 2024, the United States sent preservation letters pursuant to 18 U.S.C. § 2703(f) to AT&T, Verizon, and T-Mobile that requested the providers preserve the data identified in Attachment A.

23.     Based on my training and experience, I know that cellular providers, such as AT&T, Verizon, and T-Mobile, have the ability to query their historical records to determine which cellular device(s) connected to a particular cellular tower during a given period of time and to produce the information described above. I also know that cellular providers have the ability to determine which cellular tower(s) provided coverage to a given location at a particular time.

24.     Based on my training and experience and the above facts, information obtained from cellular service providers such as AT&T, Verizon, and T-Mobile that reveals which devices used a particular cell tower (and, where applicable, sector) to engage in particular

communications can be used to show that such devices were in the general vicinity of the cell tower at the time the communication occurred. Thus, the records described in Attachment A will identify the cellular devices that were in the vicinity of the MPV VOR station on June 30, 2024, when the station sustained damage and subsequently stopped functioning. This information, in turn, will assist law enforcement in determining which person(s) were in the vicinity of the station on that day, as well as assist law enforcement in identifying the individual(s) responsible for the damage to the MPV VOR station.

25.     The government will take steps to protect tower dump information related to innocent third parties by seizing only information relevant to phones that used more than one tower identified by the government.

## AUTHORIZATION REQUESTS

26.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c).

27.     I further request that the Court direct AT&T, Verizon, and T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T, Verizon, and T-Mobile who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Attested to by the affiant:

_____

Michael P. DiCaprio
Special Agent, FBI

Sworn to by the applicant via reliable electronic means under Federal Rule of Criminal
Procedure 4.1(b)(2)(A)—specifically, a video call—on this _/4ᵗʰ_ day of August, 2024.

_Kei J. Dgl_

HON. KEVIN J. DOYLE
United States Magistrate Judge
District of Vermont